**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**PLUG POWER,**

                                        **Plaintiff,**

        **vs.**                                                    **1:26-CV-1277**
                                                                   **(MAD/PJE)**

**MAZDAK SHOKRIAN,**

                                        **Defendant.**

---

**APPEARANCES:**                                **OF COUNSEL:**

**DLA PIPER LLP US**                            **MALLORY T. BIBLO, ESQ.**
1900 N. Pearl Street, Suite 2200                **GARRETT D. KENNEDY, ESQ.**
Dallas, Texas 75201
Attorneys for Plaintiff

**ROSENBERG & ASSOCIATES**                      **GREGG ROSENBERG, ESQ.**
3518 Travis
Suite 200
Houston, Texas 77002
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

Plaintiff Plug Power, Inc. ("Plug" or "Plug Power") initiated this action through the filing of a complaint on June 9, 2026, in Albany County Supreme Court against Defendants Mazdak Shokrian ("Shokrian") and Christopher Rial ("Rial").  *See* Dkt. No. 2.  Plug Power alleges that Defendants, former Plug Power employees, violated their respective non-compete agreements. *See id.*  The same day Plaintiff filed its complaint in state court, it also filed a motion for a preliminary injunction asking the court to "direct[] Shokrian to comply with his contractual

obligations . . . ." Dkt. No. 1-1. On June 15, 2026, Albany County Supreme Court Justice Sherri Brooks-Morton entered an order to show cause, scheduled a hearing for June 23, 2026, and entered a temporary restraining order against Shokrian. *See id.* at 120-23.

On June 18, 2026, Shokrian removed the action from state court alleging diversity jurisdiction. *See* Dkt. No. 1. As part of his removal filing, Shokrian indicates that Plug Power resides in Albany, New York, and he resides in Harris County, Texas. *See* Dkt. No. 1-4 at 1.

On June 22, 2026, Judge Brooks-Morton issued an amended order rescheduling the hearing for July 27, 2026. *See* Dkt. No. 10-1 at 2. She kept the temporary restraining order in place. *See id.* at 4-5.

On June 24 and 25, 2026, the parties filed letters asking this Court's permission to file motions which would seek conflicting relief. *See* Dkt. Nos. 7, 10. Shokrian sought to file a motion to vacate or modify the state court order, expedite discovery, and transfer the case. *See* Dkt. No. 7. Plaintiff sought permission to file a motion for a preliminary injunction. *See* Dkt. No. 10. The Court granted both requests, ordering the parties to file their motions simultaneously and scheduling a hearing. *See* Dkt. No. 11. The Court held that "the state court's Order shall remain in effect until such time as the Court orders otherwise." *Id.* Both parties then submitted their filings and responses in opposition to each other. *See* Dkt. Nos. 14, 15, 19, 21.

On July 16, 2026, Plug Power filed a notice of voluntarily dismissal as to Defendant Rial.[1] *See* Dkt. No. 20. A hearing was held before the undersigned on July 20, 2026. Defendant Rial was terminated from the action the same day. *See* Dkt. No. 22.

---

[1] Pursuant to the Federal Rules of Civil Procedure, "the plaintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment[.]" FED. R. CIV. P. 41(a)(1)(A)(i).

For the following reasons, Plaintiff's motion for a preliminary injunction is granted and Shokrian's motion to modify or vacate the state court order and to transfer the case is denied.

## II. BACKGROUND

Plug Power is a Delaware corporation with its principal place of business in Slingerlands, New York. *See* Dkt. No. 2. at ¶ 7. Plug Power is a hydrogen energy company. *See id.* at ¶¶ 14-15. Defendant Shokrian was the Senior Director of Technology, Engineering & Design at Plug Power between January of 2022 and November 10, 2025. *See id.* at ¶ 8. Shokrian is a resident of Texas. *See id.* Defendant Rial was Plug Power's Director of Business Development and Senior Director of Sales & Business between January of 2022 and August 25, 2025. *See id.* at ¶ 9. Rial is also a resident of Texas. *See id.* Plug Power alleges that venue is proper in this District because Shokrian's contract includes a forum selection clause identifying Albany as the proper venue. *See id.* at ¶ 13.

In January of 2022, Plug Power acquired Joule Processing LLC ("Joule"), which "was an engineering, process equipment, services, and process optimization company with a strong track record of execution for the largest EPC (Engineering, Procurement, and Construction) and oil and gas midstream companies." *Id.* at ¶¶ 22-23. "In other words, Joule engineered, designed, and fabricated cryogenic gas processing equipment for over a decade prior to the acquisition." *Id.* at ¶ 23. Shokrian worked for Joule when Plug Power acquired it. *See id.* at ¶ 31. Shokrian accepted a position with Plug Power on or about January 11, 2022. *See id.* at ¶ 32. "When Shokrian began employment with Plug, he received a copy of the Employee Handbook and executed a corresponding Acknowledgement and Receipt on March 22, 2022." *Id.* at ¶ 33. He signed the Employee Handbook on March 22, 2022, *see* Dkt. No. 15-3 at 2, which states that "nothing in the Employee Handbook creates, or is intended to create a promise or representation of continued

3

employment and that my employment with the Company is at-will and may be terminated at any time at the will of other the Company or myself with or without cause or notice." *Id.*

As part of Shokrian's position, "Plug provided Shokrian with significant access to its confidential and proprietary information, key customer accounts, and customer goodwill. This included, among other things, its customer lists, customer preferences and information, financial information, vendor information, and proprietary information about Plug's systems, processes, and expansion efforts." Dkt. No. 2 at ¶ 37. In May of 2025, Plug Power identified Shokrian as a "key contributor" which included a significant salary bonus. *See id.* at ¶ 40. "To be eligible for the key contributor bonus, employees were required to sign a '2025 Key Contributor Agreement' wherein they acknowledged the criteria for receipt of the bonus and agreed to execute a non-solicitation / non-compete agreement. Shokrian signed the 2025 Key Contributor Agreement on or about May 30, 2025." *Id.* at ¶ 41. The Agreement contains non-compete and non-solicitation provisions stating that Shokrian will not "directly or indirectly" "work in any capacity" "for any business involved in" "designing or manufacturing [proton exchange membrane] fuel cell systems." *Id.* at ¶¶ 47-48. Likewise, Shokrian agreed not to "work in any capacity" "for any other industries in which [Plug] has done business during Employee's employment with [Plug] or which [Plug] was actively considering during such period." *Id.* at ¶ 47. The agreement states that the non-compete clause will apply "for a one (1) year period after Employee's employment with [Plug] ends, whether voluntarily or involuntarily . . . ." *Id.* Part of the agreement also states that "[i]n the event Employee breaches a time-limited restriction contained in [his a]greement, the Employee acknowledges and agrees that the applicable period of restriction shall be extended by one day for each day Employee is found to have been in violation of such restriction up to, but not

4

to exceed, the length of time that is equal in length to the period of restriction that would have applied absent the violation." Dkt. No. 15-49 at 9.

According to Plug Power, "[o]n or about November 10, 2025, Plug terminated Shokrian's employment for Cause following an internal investigation, which determined that Shokrian had been dishonest during the course of an earlier workplace investigation." Dkt. No. 2 at ¶ 52. Specifically, Plug Power contends that "[a]s early as August 2024, Shokrian created calendar appointments referencing a 'New Co' and began outlining business plans that included, among other focus areas, methanol production." *Id.* at ¶ 83.

In its complaint, Plug Power details numerous calendar appointments that Shokrian made for himself regarding "Strategy/Planning" and "Networking." *Id.* at ¶¶ 84-106. "On February 24, 2025, documents were filed with the Texas Secretary of State to create a limited liability company called 'Enoxis LLC.' The entity's address was listed as Shokrian's home address, and Shokrian and his wife were listed as the entity's managing members." *Id.* at ¶ 107. "Two weeks prior, on February 9, 2025, Shokrian created a calendar appointment titled 'Chris: Energy transition products & Strategy' with a start date of February 24, 2025—the very day that Enoxis LLC was created." *Id.* at ¶ 108. Defendant Rial's first name is Christopher and his Plug Power e-mail was Chris Rial. *See id.* at ¶ 110. For example, "[o]n June 11, 2025, Shokrian created a calendar appointment with an apparent to-do list that included 'Ask for promotion,' 'Karyabiiii,' and 'Start a BOG liquefier for LNG – get seed funding start it: develop project an do LNG+ gas treatment + ORC.'" *Id.* at ¶ 121. According to Plug, "[o]ne common code used by Shokrian was 'Karyabi' or 'Kar.' 'Karyabi' is the Farsi word for 'employment' or 'job.'" *Id.* at ¶ 100. And "Shokrian also used ellipses (e.g., '…...') as an apparent placeholder for his personal venture." *Id.* at ¶ 101.

"[O]n November 23, 2024, Shokrian created a calendar appointment called 'Networking for.......' with a start time in January 2025." *Id.* at ¶ 102.  Then, "[o]n December 9, 2024—in the midst of Shokrian's communications with his contact at the process  engineering services firm— Shokrian created a calendar appointment called 'Technology Development to Dos.'  The notes included a reference to e-mailing his contact and 'think about opportunities' and 'call / networking for finding ………………… kar.'"  *Id.* at ¶ 103.  "On February 18, 2025, less than a week before incorporation, Shokrian created an appointment called 'Name for ……' with a start time of February 19, 2025[,] at 1:00 p.m. central (5:00 p.m. UTC).  The coded language appears to reflect the process of selecting a name for the entity that would be incorporated the next week."  *Id.* at ¶ 109.

Plug Power contends that throughout this same time, Shokrian demonstrated frustration with Plug Power regarding "clear authority," a "promotion," and "operat[ing] in a system that [he] might have a trivial role."  *Id.* at ¶¶ 111-14.  Shokrian indicated that he wanted "to be recognized for what [he had] done for this company and see respect because of that" and was "happy to resign."  *Id.* at ¶¶ 114-15.  Shokrian wanted Plug Power to "[c]hange [his] title to VP of strategy and technology."  *Id.* at ¶ 115.

Plug Power also alleges that in March of 2021, Shokrian began to develop "a potential relationship with W2E," which "is an industrial agriculture technology company that converts livestock manure into hydrogen, methanol, and other clean commodities."  *Id.* at ¶¶ 123-24.[2]  Originally, the discussions with W2E were "focused on a potential liquefaction

---

[2] Throughout the complaint, Plug Power refers to this third-party company as "Company W." Dkt. No. 2 at ¶ 122.  However, Shokrian provided a declaration from the Chief Executive Officer of Thermolic Corporation which was previously known as W2E renewable Solutions.  *See* Dkt. No. 14-5.  During the show cause hearing, the parties confirmed that "Company W" is the same as W2E.  The Court will refer to the company as W2E throughout this decision.

sale, whereby Plug would sell its proprietary hydrogen liquefiers to W2E to be used in W2E's process of converting manure to liquid hydrogen" and "a potential investment by Plug into a W2E project that would produce liquid hydrogen from manure." *Id.* at ¶¶ 126-17. On April 15, 2025, Shokrian, Rial, and another Plug Power employee traveled to meet with W2E to discuss W2E's technology. *See id.* at ¶ 128. "Shortly after the April 2025 trip by Shokrian and Rial to Denver, Plug's upper management decided not to pursue an investment in a W2E project at that time." *Id.* at ¶ 130. However, "[o]n April 23, 2025, Shokrian, Rial, and another Plug colleague had a three-hour meeting with W2E representatives via Microsoft Teams." *Id.* at ¶ 133. "On April 25, 2025, Shokrian created a calendar appointment called 'Methanol Stuff: Process + W[ ] path.' The body of the calendar appointment included hyperlinks and detailed technical notes, suggesting active work on developing a methanol offering tied to the W2E relationship." *Id.* at ¶ 134.

"On May 6, 2025, Rial e-mailed spreadsheets from his Plug work account to his personal Gmail account detailing equipment costs and potential offerings for W2E." *Id.* at ¶ 135. "Through June and into July and August 2025, Shokrian and Rial continued to cultivate a relationship with W2E related to methanol." *Id.* at ¶ 136. "On May 28, 2025, Shokrian invited W2E representatives to a Microsoft Teams meeting on June 17, 2025 regarding 'Follow Up on Methanol.'" *Id.* at ¶ 137. Plug Power alleges that "Shokrian and Rial also scheduled a lunch in Houston on June 16, 2025 with the President of W2E—but did not include the Plug colleague that joined them for the visit to Colorado in April 2025." *Id.* at ¶ 138. "On June 17, 2025, Shokrian created a calendar appointment called 'Org Chart change + Info from W[ ]+EMS software' with a 'Start Time' of June 24, 2025." *Id.* at ¶ 139. "On June 21, 2025, Shokrian

created two calendar appointments with a 'Start Time' of June 23, 2025. One was called 'NDA W[ ] – review.' The other was called 'call Chris: W[ ], H2 Expo.'" *Id.* at ¶ 140.

Plug Power contends that "[a]s demonstrated by his calendar entries, Shokrian was actively evaluating how to structure and fund a methanol venture in connection with W2E and Rial in August 2025." *Id.* at ¶ 148. "On Sunday, August 3, 2025, Shokrian created a calendar appointment named 'Lawyer' with a start time of August 5, 2025." *Id.* at ¶ 149.

As to how Plug Power became of aware of these alleged actions, it contends that "[b]eginning in July 2025, and consistent with Shokrian's notes to self in his calendar appointments regarding his cultivation of a methanol-related opportunity outside of his work at Plug, Shokrian directed Plug employees on his team to perform substantial work on methanol development that would support his side venture and pursuit of a relationship with W2E." *Id.* at ¶ 158. Specifically, "[i]n July 2025, Plug had a large project that included a methanol component, but Plug had already decided to use a different company—i.e., not W2E—to perform the scope of work related to methanol." *Id.* at ¶ 159. "In other words, there was no reason why Shokrian should have instructed Plug employees to develop specifications for methanol production . . . because that scope of work had already been assigned to another company and would not be handled internally by Plug." *Id.*

At one point, "Shokrian instructed the Senior Manager that he should not save any of his work related to methanol on Plug's shared drive and should instead keep the materials in his personal folders. This was the only time in the course of the Senior Manager's work under Shokrian that Shokrian gave such an instruction to the Senior Manager." *Id.* at ¶ 172. "Shokrian also instructed the Senior Manager that he should not tell anyone about the work he was doing at Shokrian's direction on methanol—including Shokrian's supervisor specifically. This was the

only time in the course of the Senior Manager's work under Shokrian that Shokrian gave such an instruction to the Senior Manager." *Id.* at ¶ 173.

Then, on August 25, 2025, "Rial's employment with Plug ended . . . as part of a reduction in force." *Id.* at ¶ 168. "In late September and into October 2025, Rial reached out to Plug to ask Plug to waive his non-compete obligation. Plug told Rial it would consider an exemption if Rial told Plug where he wanted to work. Rial refused to provide details, stating only that he was looking at 'start ups.'" *Id.* at ¶ 182. Despite Rial being terminated in August of 2025, Rial attended an October 29, 2025, meeting with Shokrian and W2E in Denver, Colorado, *see* Dkt. No. 14-5 at 2-3, and Shokrian had a call with "Chris BD 8pm - 11 p.m" on October 31, 2025, Dkt. No. 2 at ¶ 180.

"In early October, Shokrian's supervisor spoke with an employee who works under the Design Manager, who said that they were working on a 'secret project' for Shokrian related to methanol." Dkt. No. 2 at ¶ 183. "On November 4, 2025, Plug's HR team met with Shokrian. When asked if he was involved with any personal ventures outside of his Plug employment, Shokrian denied any such involvement." *Id.* at ¶ 191. "Shokrian also denied registering any business entity, using any Plug resources to support a personal business project, or approaching any current or potential clients, customers, vendors, or suppliers in connection with a personal business venture." *Id.* "Shokrian did, however, admit that he had met with W2E representatives when he was in Denver. He claimed that W2E called him to evaluate some technology and that it was related to the prior conversations with W2E in April 2025." *Id.* at ¶ 192. "Shokrian did not say that he had discussed potential employment with W2E or that Rial had joined him in any meetings with W2E." *Id.*

9

"On November 10, 2025, Plug's HR team met with Shokrian again. Shokrian again denied any personal ventures outside of Plug, registering any business entity, using Plug resources to support a personal business project, or approaching any current or potential clients, customers, vendors, or suppliers in connection with a personal business venture." *Id.* at ¶ 193. "But this time, Shokrian admitted that he had spoke with W2E regarding potential employment—although he still did not mention Rial's presence in Denver during the W2E meetings." *Id.* "At the conclusion of the November 10, 2025[,] meeting, Plug's HR team informed Shokrian that the Company had concerns that Shokrian was not being fully honest in his responses given the conflict between the information obtained by Plug and the answers provided by Shokrian, and therefore Plug would terminate Shokrian's employment effective immediately." *Id.* at ¶ 194. "Also on November 10, 2025, Plug informed Rial that it would not be executing a separation agreement with Rial due to evidence that he had violated his non-compete obligations." *Id.* at ¶ 195.

Plug Power sent Shokrian a Cease-and-Desist letter on November 17, 2025, accusing him of soliciting a prospective Plug Power customer—W2E. *See id.* at ¶ 53; *see also id.* at 62-64.

"On November 18, 2025, an attorney contacted Plug to inform [Plug Power] that they had been retained to represent both Shokrian and Rial regarding the termination of their employment." *Id.* at ¶ 196.

On April 2, 2026, Shokrian's attorney sent a letter to Plug Power informing the company that Shokrian was in discussions about potential employment with ACD, LLC d/b/a Nikkiso Expander Application Technology ("ACD") as ACD's Engineering Operations Manager. *See id.* at ¶ 54. The letter asked Plug Power to confirm that any potential employment with ACD would not violate Shokrian's non-compete agreement. *See id.* at ¶ 55. Plaintiff alleges that "ACD is a

part of the Industrial Division of Nikkiso Co., Ltd. and its Nikkiso Group companies ("Nikkiso"). Like Plug, Nikkiso's Industrial Division designs and manufactures liquefaction systems and cryogenic equipment." *Id.* at ¶ 56.  On April 27, 2026, Plug Power, through counsel, responded to Shokrian's letter by stating that his employment with ACD would violate the non-compete agreement. *See id.* at ¶¶ 58-60.[3]  Plaintiff alleges that despite its response, Shokrian is currently employed by ACD.  *See id.* at ¶ 61.

On July 14, 2026, Shokrian filed his answer to Plug Power's complaint.  *See* Dkt. No. 17. As part of the allegations that Shokrian admits, he agrees that while he was employed at Plug Power, he "had direct access to Plug's key customers and vendors, sensitive financial and product information, and business strategies.  In exchange for this access, Shokrian contractually agreed that he would not work for any of Plug's competitors or solicit Plug's customers for a one-year period in the event he left Plug."  Dkt. No. 2 at ¶ 3; Dkt. No. 17 at ¶ 3.  "Shokrian admits that his employment agreement established jurisdiction in New York but denied that venue is appropriate in this case."  Dkt. No. 17 at ¶ 11.  Shokrian does not dispute the accuracy of the employment agreement provisions, including the non-compete and non-solicitation provisions.  *See* Dkt. No. 2 at ¶¶ 27-28, 33-35, 43-51.  Shokrian agrees that he "acknowledged in the Agreement, [that] 'breach of any of the terms of this Agreement will result in material, irreparable injury to the Company for which any remedy at law will not be adequate.'"  *Id.* at ¶ 74 (citation omitted).

Shokrian also agrees that "[a]s a result of his position as a Senior Director, Plug provided Shokrian with significant access to its confidential and proprietary information, key customer

---

[3] Shokrian takes issue with Plug Power's failure to earlier respond to his letter.  However, the Court finds this argument to be a red herring.  Even if it would have been professionally courteous to respond faster to Shokrian's letter, there are no legal issues presently before the Court which turn on how long Plug Power took to write back to Shokrian's attorney.

accounts, and customer goodwill." *Id.* at ¶ 37.  Shokrian does not dispute that while working for Plug Power, he was developing and eventually registered his own LLC. *See id.* at ¶¶ 89-93.  He likewise admits the contents of his calendar appointments which included references to "'Karyabi' or 'Kar.'  'Karyabi' is the Farsi word for 'employment' or 'job.'" *Id.* at ¶ 100; Dkt. No. 17 at ¶ 100.  Shokrian agrees that in late 2024 and early 2025, his calendar appointments indicated frustration with Plug Power including "that he could 'not operate in a system that [he] might have trivial role," where his "work [is] not recognized despite huge success and almost handling the work singlehannedly [sic] and training babies."  Dkt. No. 2 at ¶¶ 114-15; Dkt. No. 17 at ¶¶ 114-15.  Shokrian wrote, "No Promotion *****until all is solved do not ask me for any contribution – happy to resign.'"  Dkt. No. 2 at ¶ 115; Dkt. No. 17 at ¶ 115.  Shokrian indicated that he "need[ed] a bigger scope and title + expanding the business and want to do it under you but if not have to go out of this group or resign.'"  Dkt. No. 2 at ¶ 116; Dkt. No. 17 at ¶ 116.

Shokrian also agrees that he continued to engage with "W2E" after the initial meeting, but denies that Plug Power decided not to pursue a business relationship with W2E.  Dkt. No. 2 at ¶¶ 130-137; Dkt. No. 17 at ¶¶ 130-37.  He also admits that he spoke to "W2E" about a methanol plant, but contends that "the discussion was high level to determine if a methanol plant was feasible and what would be needed to secure funding."  Dkt. No. 17 at ¶ 157.  Nevertheless, Shokrian agrees that he "asked [Plug Power's] Senior Manager to put together a budget estimate for a methanol plant" and "instructed the Senior Manager that he should not save any of his work related to methanol on Plug's shared drive and should instead keep the materials in his personal folders."  Dkt. No. 2 at ¶¶ 171-72; Dkt. No. 17 at ¶¶ 171-72.  He "also instructed the Senior Manager that he should not tell anyone about the work he was doing at Shokrian's direction on methanol—including Shokrian's supervisor specifically."  Dkt. No. 2 at ¶ 173; Dkt. No. 17 at ¶

12

173.  "This was the only time in the course of the Senior Manager's work under Shokrian that Shokrian gave such an instruction to the Senior Manager."  Dkt. No. 2 at ¶¶ 172-73; Dkt. No. 17 at ¶¶ 172-73.  Shokrian does not dispute that, in November and December of 2025,  he denied human resources' allegation that he had been "involved with any personal ventures outside of his Plug employment" or "register[ed] any business entity."  Dkt. No. 2 at ¶¶ 191, 193; Dkt. No. 17 at ¶¶ 191, 193.

## III. DISCUSSION

### A.      Transfer

Shokrian moves this Court to transfer the case "to the to the Southern District of Texas – Houston Division pursuant to U.S.C. § 1404 for two reasons.  First, both Shokrian and Rial reside in the Southern District of Texas and it would be extremely inconvenient for them to appear in the Northern District of New York . . . ."  Dkt. No. 14 at 19.  "Second, while Plug relies on the forum selection clause in Shokrian's Agreement stating that New York shall be the exclusive forum for any proceeding, it has ignored the forum selection clause in Rial's Agreement, which provides that Texas shall be the exclusive forum for any proceeding."  *Id.*  Shokrian argues that because Plug Power agreed to litigate in Texas as part of Rial's employment agreement, then Plug Power "is obviously 'picking and choosing' how it elects to enforce its forum selection clause . . . ."  *Id.*

As an initial matter, as part of his transfer argument, Shokrian repeatedly references both "Defendants."  Dkt. No. 14 at 20-22.  Defendant Rial has never appeared in this action and Shokrian's attorney does not represent Defendant Rial.  Plaintiff voluntarily dismissed Rial from the action on July 16, 2026.  *See* Dkt. No. 20.  As such, the Court does not give much, if any, weight to counsel's unsworn assertions about convenience to, or contracts made by, Rial.  However, during the hearing held on July 20, 2026, Shokrian's attorney explained that he was not

13

conceding the venue issue but was not strenuously advancing the venue argument in light of Rial's dismissal from the case.

As to the merit of the transfer issue, the Court finds that the forum selection clause contained in Shokrian's agreement with Plug Power is enforceable and transfer is not warranted at this juncture.

"Section 1404(a) of Title 28 of the United States Code allows a district court to transfer a civil action to any other district where the action might have been brought '[f]or the convenience of parties and witnesses, in the interest of justice.'" N. *Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 648 F. Supp. 3d 401, 412-13 (N.D.N.Y. 2022) (quoting 28 U.S.C. § 1404(a)). "'The objectives of § 1404(a) are to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Id.* at 412-13 (quoting *Huntley v. Sprout Foods, Inc.*, No. 3:21-CV-00488, 2022 WL 138015, *2 (D. Conn. Jan. 14, 2022)) (additional citations and quotation marks omitted). "'When considering whether to transfer a case, a district court must conduct a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer.'" *Id.* (quoting *View 360 Sols. LLC v. Google, Inc.*, No. 1:12-CV-1352, 2013 WL 12130430, *4 (N.D.N.Y. Aug. 13, 2013)).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (quoting *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)). "The 'enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system.'" *Id.* (citation omitted). "For that reason, and because the

14

overarching consideration under § 1404(a) is whether a transfer would promote 'the interest of justice,' 'a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.'" *Id.* (citation omitted); *see also Mt. Hawley Ins. Co. v. Caltec Corp.*, 823 F. Supp. 3d 331, 339 (S.D.N.Y. 2025) (quoting *Encompass Aviation, LLC v. Surf Air, Inc.*, 2018 WL 6713138, *5 (S.D.N.Y. Nov. 30, 2018))

"A forum-selection clause is presumptively enforceable if it 'was reasonably communicated to the party resisting enforcement,' has 'mandatory force,' and 'covers the claims and parties involved in the dispute.'" *Du Quenoy v. Am. Univ. of Beirut*, 828 Fed. Appx. 769, 771 (2d Cir. 2020) (summary order) (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007). "A party may overcome this presumption only 'by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* (quoting *Phillips*, 494 F.3d at 383-84). The Second Circuit has explained as follows:

> [A] forum-selection clause will not be enforced only if "(1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court."

*Id.* (quoting *Martinez v. Bloomberg LP*, 740 F.3d 211, 228 (2d Cir. 2014)). "These exceptions are 'interpreted narrowly.'" *Id.* (quoting *S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 711 (2d Cir. 2010)).

The Supreme Court has instructed that "a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests." *Atl. Marine Const. Co.*, 571 U.S. at 64. "When parties agree to a forum-

selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* "A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* In other words, "[w]hatever inconvenience the parties would suffer by being forced to litigate in the contractual forum as they agreed to do was clearly foreseeable at the time of contracting." *Id.* (citations omitted) (cleaned up).

Here, Shokrian does not argue that his contractual agreement was the product of force, coercion, or is otherwise invalid. He does not argue that the law that would be applied here is fundamentally unfair. Shokrian does not, and cannot, assert that enforcement of the clause is against public policy where public policy favors enforcement of contractual agreements. He argues only that this District is personally inconvenient and that it is unfair that his contract places venue in this District whereas Rial's agreement places venue in Texas.

Defendant Shokrian has not presented any legal authority requiring a federal district court to transfer a case to another district because multiple employee defendants have different forum selection clauses in their individual employment contracts with the same plaintiff employer.

Shokrian is the signatory to a valid forum selection clause. He does not now get to claim it is inconvenient because he prefers someone else's forum selection clause. Importantly, Rial has been dismissed from the action; therefore, the Court is not presented with two conflicting forum selection clauses. The only contract that is appropriately before the Court is the one between Shokrian and Plug Power. Because Defendant Shokrian is the signatory to a valid forum selection clause which designates this District as the proper venue, the Court denies Shokrian's motion to transfer the case to Texas.

16

**B.      Preliminary Injunction**

"'A preliminary injunction is an extraordinary and drastic remedy' and 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice P.C.*, 120 F.4th 59, 79 (2d Cir. 2024)).  "To obtain a preliminary injunction, a party must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).  "'The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction' and 'must therefore be satisfied before the other requirements for an injunction can be considered.'" *Id.* (quoting *State Farm*, 120 F.4th at 80).

*1.  Irreparable Harm*

"'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Rood, Riddle and Partners, PSC v. Dr. Morgan Day O'Brien, DVM*, No. 1:26-CV-385, 2026 WL 1758248, *5 (N.D.N.Y. June 18, 2026) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  "'That is because a preliminary injunction strives to maintain the status quo in order to protect [the] plaintiff from irreparable injury while awaiting final decision on the merits.'" *Id.* (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (additional citation and quotation marks omitted).  "'To satisfy their burden to show irreparable harm, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the

harm.'" *Id.* (citation omitted); *see Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). "'Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'" *Rood*, 2026 WL 1758248, at *5 (quoting *TomGal LLC v. Castano*, No. 22-CV-9516, 2022 WL 17822717, *3 (S.D.N.Y. Dec. 19, 2022)).

"'The loss of customer relationships and goodwill that results from a breach of a covenant not to compete are generally sufficient to demonstrate irreparable harm.'" *Id.* (quoting *Tecspec LLC, et al. v. Michael Donnolo, et al.*, No. 25-CV-1676, 2026 WL 1361842, *4 (2d Cir. May 15, 2026) (summary order)) (collecting cases). "'[T]]hough courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case.'" *JTH Tax*, 62 F.4th at 673 (quoting *Baker's Aid, Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987)). "There is thus no 'automatic assumption' that 'irreparable harm must inevitably be assumed in breach of covenant cases.'" *Id.* (citation omitted).

"'The disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages.'" *Palantir Techs., Inc. v. Jain*, No. 25-CV-8985, 2026 WL 622007, *8 (S.D.N.Y. Mar. 5, 2026) (quoting *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019)). 'However, the mere exposure of an employee to the trade secrets or confidential information of a former employer does not, without more, create a threat of irreparable harm." *Id.* (quoting *Accenture LLP v. Trautman*, No. 21-CV-2409, 2021 WL 6619331, *15 (S.D.N.Y. June 8, 2021)). "The operative question is whether there is a risk that such information will be used or disclosed in a way to cause harm." *Id.* (citation and quotation marks omitted); *see also Geminatio, Inc. v. Hustad*, No.

1:25-CV-00361, 2025 WL 1220233, *5 (N.D.N.Y. Apr. 28, 2025) ("[T]he vague risk that [Defendants] could disseminate the information if [they] wish[ ] does not satisfy [Plaintiff's] burden" for a preliminary injunction in a trade secrets case") (alterations in original).

"[T]he 'inevitable disclosure' doctrine . . . dictates that risk of irreparable harm results from a situation in which a defendant possesses trade secret information and disclosure of those secrets is inevitable." *Palantir Techs.*, 2026 WL 622007, at *8 (citing *Int'l Bus. Machines Corp. v. Papermaster*, No. 08-CV-9078, 2008 WL 4974508, *7 (S.D.N.Y. Nov. 21, 2008)). "'[A] plaintiff need not necessarily satisfy each of the elements of the doctrine of inevitable disclosure of trade secrets to establish a likelihood of irreparable harm from disclosure of trade secrets or confidential information.'" *Id.* (citation omitted). "Instead, [a] past employer may still be exposed to a likelihood of irreparable harm . . . if the former employee . . . has shown such a disregard for her legal and contractual obligations in the past that there is a risk she will disregard those obligations in the future." *Id.* (citation and quotation marks omitted); *see also Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (granting preliminary injunction where "the evidence presented at the hearing clearly shows that both Paolo and Elliott possess confidential customer information belonging to Ecolab and are intent upon using it to lure away Ecolab customers").

"Under New York law, a trade secret is defined as 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 312 (S.D.N.Y. 1999) (quoting *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)). Courts in New York consider the following six factors in determining whether information constitutes a trade secret:

19

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)).

Part of Shokrian's Employee Patent, Confidentiality, Non-Compete, and Non-Solicitation Agreement states that "[e]mployee acknowledges and agrees that Employee's breach of any of the terms of this Agreement will result in material, irreparable injury to the Company for which any remedy at law will not be adequate." Dkt. No. 2 at 57-58. The Agreement also states that Shokrian "agrees that the disclosure of such customer information, absent the Company's consent, will cause great and irreparable harm." *Id.* at 56. Shokrian admitted in his answer to Plaintiff's complaint that "[a]s a result of his position as a Senior Director, Plug provided Shokrian with significant access to its confidential and proprietary information, key customer accounts, and customer goodwill." Dkt. No. 2 at ¶ 37; Dkt. No. 17 at ¶ 37. In March of 2025, when Shokrian was designated as a "key contributor" by Plug Power, he acknowledged that Plug Power "is engaged in a highly specialized and competitive business and that by virtue of Employee's position with [Plug], and [Plug]'s Confidential and Proprietary Company Information that the Employee has or will receive, Employee's engaging in business which is in competition with [Plug] will cause [Plug] great and irreparable harm." Dkt. No. 2 at ¶ 43; Dkt. No. 17 at ¶ 43.

Shokrian does not dispute his contractual admissions. "'While not dispositive, courts may view [such terms] as evidence of an admission that irreparable harm has occurred.'" *Rood*, 2026 WL 1758248, at \*5 (quoting *Hercules Pharms., Inc. v. Cherne*, No. 24-CV-5659, 2024 WL 4406899, \*2 (E.D.N.Y. Sept. 18, 2024) (collecting cases), *aff'd*, No. 24-2545-CV, 2025 WL 1099431 (2d Cir. Apr. 14, 2025)); *see Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[T]he employment contract sought to be enforced concedes that in the event of [the employee's] breach of the post-employment competition provision, [the company] shall be entitled to injunctive relief, because it would cause irreparable injury. Such, we think, might arguably be viewed as an admission by [the employee] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision").

Additionally, Plug Power has presented evidence that Shokrian's conduct will result in the loss of customer relationship or goodwill or result in the disclosure of confidential information.

Plug Power presented the Court with an affidavit from Daniel Kennedy, its Vice President of Process Technology, who attested under the penalty of perjury that Shokrian's relationship with ACD has placed "multiple projects on hold with Nikkiso and ACD" and prohibited a project between Plug Power and "W2E" from moving forward. Dkt. No. 15-2 at ¶¶ 17, 20.

Shokrian submitted a declaration with his response to Plug Power's motion. *See* Dkt. No. 19-1. In it, he does not negate Mr. Kennedy's assertions about projects with ACD or W2E being placed on hold because of Shokrian's conduct. Rather, Shokrian asserts that Mr. Kennedy had a conflict of interest at Plug Power because Plug utilized a company for certain technological needs that was Mr. Kennedy's family company. *See id.* at ¶¶ 4-5. Shokrian attests that he did not engage his team at Plug Power "in any sort of 'secret project' with the intention or effort of competing with or otherwise deceiving Plug." *Id.* at ¶ 9. Yet, in his answer to the complaint,

21

Shokrian admits to asking one of his team members to work on a project but to not save the materials on Plug's shared drive or tell others. *See* Dkt. No. 2 at ¶¶ 172, 173. He also admits that he did create his own business and denied such to human resources. See id. at ¶¶ 107-09, 190-91; Dkt. No. 17 at ¶¶ 107-09, 190-91. Shokrian's has not presented any evidence to rebut Plug Power's assertion that Shokrian's conduct has stalled Plug Power's ability to move forward with ACD and W2E.

As to the work Shokrian does for ACD, Shokrian declares that "[a]ny competent engineer with my background and experience would possess independent knowledge, as I do, of both ORC and LNG without needing to draw on specific knowledge gained from the short time I worked at Plug." Dkt. No. 19-1 at ¶ 14. Yet, he also states that "[a]ll of the information and experience that I use in my current position was gained from my long career in the oil and gas industry." *Id.* at ¶ 16. Part of his "long career" was at Plug Power. Additionally, in July and September of 2025, Shokrian was making notes in his Plug Power calendar entries such as, "Start a BOG liquefier for LNG – get seed funding start it: develop project an do LNG+ gas treatment + ORC." Dkt. No. 15-18 at 3; *see also* Dkt. No. 15-25 at 2. As Plug Power points out, this appeared to indicate that "the processes in which he is admittedly involved—ORC and LNG boil off gas—both potentially involve know-how acquired from Plug . . . ." Dkt. No. 21 at 15. Additionally, Shokrian signed an agreement with Plug Power in which he agreed that as a result of his position at Plug Power, he had or would receive confidential and proprietary information. *See* Dkt. No. 2 at ¶¶ 37, 43; Dkt. No. 17 at ¶¶ 37, 43.

Shokrian attests that "[t]o my knowledge, as long as I was employed, Plug was not in the methanol business; it had never carried out any methanol project, advertised a methanol technology, and had no experience in methanol." Dkt. No. 19-1 at ¶ 13. Shokrian admits,

22

however, that "Plug only had a potential project for which a methanol plant was to be procured from third party vendors." *Id.* Shokrian declares that as Plug Power's "Senior Director of Technology, one of my responsibilities was exploring different avenues for expanding Plug's business diversification, which was why I was considering methanol projects." *Id.*

However, Plug Power has presented evidence that Shokrian was not engaged in projects to expand Plug Power, but to expand his personal career. In its complaint, Plug Power alleges that "[i]n July 2025, Plug had a large project that included a methanol component, but Plug had already decided to use a different company—*i.e.*, not W2E—to perform the scope of work related to methanol." Dkt. No. 2 at ¶ 159. However, Shokrian continued to engage with W2E. In a letter dated December 8, 2025, from an attorney on Shokrian's behalf to Plug Power, the attorney stated that the Shokrian's discussions with "W2E" "included potential future employment with W2E . . . and ways in which Plug might have renewed interest in the W2E project and what the scope of that might be." Dkt. No. 19-4 at 2. The attorney stated that Shokrian was only involved with W2E to assess "whether any future collaboration could advance Plug's interest." *Id.* at 3. Yet, that attorney, the Chief Executive Officer of W2E, and Shokrian all state that Shokrian was discussing potential employment with W2E, which would be against Plug's interest. *See id.*; *see also* Dkt. No. 14-5 at 4; Dkt. No. 19-1 at ¶ 12. Shokrian states that, as to his conversations with W2E, he gave "full disclosure to Plug[.]" Dkt. No. 19-1 at ¶ 12. Plug Power's entire complaint alleges otherwise by asserting that Shokrian did not disclose all of his dealings with W2E to Plug Power.

The Chief Executive Officer of W2E states that it was not W2E's view that Plug Power had any ongoing interest in W2E. *See* Dkt. No. 14-5 at 3. However, Shokrian and the attorney who drafted the December 8, 2025, letter, contend that the focus of Shokrian and W2E's entire

23

conversations were about continuing to develop a relationship between Plug Power and W2E. This issue is compounded by the fact that Defendant Rial was terminated from Plug Power on August 25, 2025, *see* Dkt. No. 2 at ¶ 168; Dkt. No. 17 at ¶ 168, but he attended the October 29, 2025, meeting with W2E. Shokrian's counsel stating during the hearing before this Court on July 20, 2026, that everything Shokrian did with W2E was to advance Plug's interests. Yet, as counsel for Plug Power pointed out, it does not make sense that Rial, a terminated employee, would attend a meeting to discuss advancing his former employer's business.

Shokrian argues that Plug Power's irreparable harm arguments are supported by "absolutely no evidence to support the contention that any of Shokrian's activities have caused it to lose resources, goodwill, business contacts, or confidential information. Shokrian was fired without good cause, baselessly accused of violating his Noncompetition Agreement, and then ignored when he tried to communicate the facts of his new employment with Plug." Dkt. No. 14 at 12. He argues he "is not in possession or control of any confidential information or materials belonging to Plaintiff, nor would he have any reason to use such information or materials given that his current role differs so significantly from that of his previous job at Plug." *Id.*

Shokrian's attorney continued to argue during the hearing that because Shokrian has not shared a single piece of confidential or proprietary information with ACD, then Plug Power has failed to demonstrate irreparable harm.

As set forth in detail in the background section of this decision, it appears that while still employed with Plug Power, Shokrian was engaging with W2E and working on building his own company. When asked by Plug Power if he was engaging in "any personal ventures," Shokrian said he was not. *Id.* at ¶ 191.

24

Shokrian does not dispute that he was building a personal business while employed by Plug Power and on Plug Power's time.  During the July 20, 2026, hearing, Shokrian's attorney argued that Shokrian's outside venture is irrelevant because the business, Enoxis, has nothing to do with hydrogen.  The Court is hard pressed to believe that Shokrian's dozens of references to "Kar" or "Karyabi" in his calendar entries concerned a clothing business where some of those same entries stated, "I need a bigger scope and title + expanding the business" and "Start a BOG liquefier for LNG- get seed funding start it: develop project an[d] do LNG+gas treatment + ORC."  Dkt. No. 2 at ¶¶ 116, 121.  However, even if Shokrian's new business did have to do with clothing and not renewable energy sources, it is Shokrian's lack of candor with his employer that supports the Court's conclusions.

For example, Shokrian argues that he is working only on LNG and ORC projects and is not working on hydrogen-related products at ACD.  However, as Plug Power's counsel stated at the hearing, Shokrian repeatedly mentioned advancing LNG and ORC projects while at Plug Power.  Therefore, either (a) Shokrian was working on those projects for other companies while at Plug Power, which would support his termination as being for cause; or (b) Shokrian was working on LNG and ORC projects for Plug Power which would  make his work at ADC directly competitive and violative of his non-compete clause.  The possibility of either being true supports the conclusion that Plug Power will suffer irreparable harm if Shokrian is permitted to continue his role at ACD in the capacity that he has, thus far.

The evidence presented by Plug Power is "actual evidence . . . that the plaintiff 'will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'"  *JTH Tax*, 62 F.4th at 673. Plug Power has presented evidence that Nikkiso and ACD engage in work related to hydrogen; no

firewall is currently in place at ACD blocking Shokrian from accessing the hydrogen aspects of the company; there are technologies, such as turboexpanders, and industries, such as LNG and ORC, that ACD is a part of and which could be advanced by the knowledge Shokrian gained while working at Plug Power.  Plug Power spent hundreds of thousands of dollars on Shokrian, keeping him employed and expanding his role and knowledge as a "key contributor."

Shokrian argues only that he has not shared a single bit of confidential or proprietary information with ACD; however, that is not the standard.  Shokrian does not dispute that his employment contract expressly stated that engagement with any competitive business would cause Plug Power irreparable harm.  He also admits to each of his calendar entries and meetings with W2E.  Because Plug Power has presented evidence demonstrating that Shokrian has "shown such a disregard for her legal and contractual obligations in the past that there is a risk she will disregard those obligations in the future," *Palantir Techs.*, 2026 WL 622007, at *8, and it is undisputed that Shokrian has confidential and proprietary knowledge regarding Plug Power's technologies and customer relationships, Plug Power has sufficiently established the threat of irreparable injury.

### 2. *Likelihood of Success*

"To establish a likelihood of success on the merits, a plaintiff must show that [it] is more likely than not to prevail on [its] claims, or, in other words, that the probability of prevailing is better than fifty percent."  *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 58 (N.D.N.Y. 2022), *aff'd*, 88 F.4th 186 (2d Cir. 2023) (quoting *Doe v. Vassar Coll.*, No. 19-CV-0601, 2019 WL 6222918, *7 (S.D.N.Y. Nov. 21, 2019)).  A plaintiff "'need not demonstrate a likelihood of success on the merits of every claim—rather, they need only show a likelihood of success on the merits of at least one of [their] claims.'"  *Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp.

3d 467, 480 (S.D.N.Y. 2025) (quoting *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019)).

Plaintiff Plug Power argues that it is likely to succeed in its breach of contract claim against Defendant Shokrian. *See* Dkt. No. 15-1 at 23-31.

Shokrian argues Plaintiff has not shown a likelihood of success because "Plug was clearly not willing to continue employing Shokrian, as it terminated his employment on or about November 10, 2025. Although Plaintiff claims that it dismissed Shokrian because it determined that he had been dishonest during a workplace investigation, this reason was fabricated." Dkt. No. 14 at 9. Shokrian asserts that "[t]here is no evidence to show that Shokrian did not fully cooperate with any investigation regarding his conduct. The articulated reason for termination was a ruse advanced in an effort to enforce an otherwise unenforceable agreement." *Id.* He then summarily avers that "the Agreement in question is unenforceable because it is not reasonable and necessary to protect valid business interests. Plug has no valid interest in preventing Shokrian from working at ACD, given that ACD does not compete with Plug and that Shokrian's current responsibilities do not overlap with those of his previous role at Plug." *Id.* Shokrian states that he "has not used any materials or information belonging to Plug in the course of his job at ACD, nor does he have any reason to, given that his role is completely different and ACD does not operate in the same line of business as Plug." *Id.*

"To prevail on a breach of contract claim under New York law, a plaintiff must show that (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *Sapio v. Selux Corp.*, 726 F. Supp. 3d 65, 100 (N.D.N.Y. 2024) (quoting *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023)).

27

"New York law subjects contractual non-compete provisions to 'an overriding limitation of reasonableness.'" *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 506 (S.D.N.Y. 2011) (quoting *Ticor Title Ins.*, 173 F.3d at 70). "Specifically, an agreement not to compete will be enforced only if 'it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not unreasonably burdensome to the employee.'" *Id.* (*quoting Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 307 (1976)). "Such agreements may be justified by the employer's need to protect itself from unfair competition by former employees." *Id.* (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 391 (1999)). The Second Circuit has noted that "to justify [enforcement of] a restrictive covenant" the plaintiff must show "[m]ore" "than that the employee excels at his work or that his performance is of high value to his employer." *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 390 n.9 (2d Cir. 1982) (*quoting Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 274 (1963)). "It must also appear that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury." *Id.*

Moreover, "[a] non-compete agreement is unenforceable under New York law where the termination of employment is involuntary and without cause." *Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744, 2021 WL 2593304, *4 (N.D.N.Y. June 23, 2021) (citing *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 89 (1979)). That is because "[w]here the employer terminates the employment relationship without cause, his action necessarily destroys the mutuality of obligation on which the covenant rests as well as the employer's ability to impose a forfeiture." *Morris v. Schroder Cap. Mgmt. Int'l*, 7 N.Y.3d 616, 621 (2006) (citation and quotation marks omitted). "Thus, although a restrictive covenant will be enforceable without regard to reasonableness if an employee left his employer voluntarily, a court must determine

28

whether forfeiture is 'reasonable' if the employee was terminated involuntarily and without cause." *Id.* (citation omitted); *see also Morris v. Schroder Cap. Mgmt. Int'l*, 445 F.3d 525, 529 (2d Cir. 2006). "Under this consideration, 'the test for reasonableness is not whether the defendant would be able to make a living in other ways, or in other occupations, but whether or not the Agreement as drafted and applied would unfairly restrain her opportunity to pursue her occupation.'" *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 329 (D. Conn. 2021) (quoting *A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 298 (D. Conn. 2015)).

Shokrian argues that (1) the non-compete clause is unenforceable because he was terminated from Plug Power without cause; (2) the provision does not apply to his work at ACD; and (3) if the provision does apply to his work at ACD, that is because the clause is too broad.

Defendant Shokrian submitted a declaration from Behrooz Ershaghi, Shokrian's ACD supervisor. *See* Dkt. No. 14-3 at 2. Therein, Mr. Ershaghi attests that Defendant "Shokrian is not involved with, nor does he have any connection with hydrogen generation and processing applications." *Id.* Mr. Ershaghi states that Shokrian "is not involved with, nor is any involvement contemplated regarding his consulting with, providing any information to [Nikkiso Expander Application Technology] or any affiliated entity regarding the designing or manufacturing of [proton exchange membrane] fuel cell systems or any application of the [] fuel cell system component thereof . . . ." *Id.* Mr. Ershaghi asserts that "[w]ith [Nikkiso Expander Application Technology, Shokrian] is not involved in the business of generating transporting, storing, or dispensing of hydrogen . . . ." *Id.* He explains that Shokrian's position "is strictly limited to two process, ORC which exclusively relates to power generation from waste hear or geothermal heat and LNG boil off gas for the marine sector. [Shokrian] also supports technical aspects and organization structure of turbo expander manufacturing." *Id.* at 3.

Defendant Shokrian also provided a declaration which states that in his position at ACD, he "is a member of Nikkiso's Clean Energy & Industrial Gas Group."  Dkt. No. 14-4 at 2. Shokrian explains that the technology he is engaged with "uses a closed loop system using Turboexpanders to generate electricity.  It is not in any way relevant to hydrogen production, storage or transportation and to my personal knowledge, Plug has never been in this business." *Id.*   He also contends that he is "in charge of creating a technology for LNG (liqu[e]fied natural gas) boil off gas (BOG) management for marine sector.  This is also not, to my personal knowledge, in conflict with Plug and only related to liquefied natural gas."  *Id.*  Shokrian states that he is "not involved in any hydrogen fuel station or electrolyzer related business and didn't know anything about that [sic] another Nikkiso business unit is involved with hydrogen electrolyzer business as they are a separate business unit of Nikkiso."  *Id.* at 4. Shokrian attests in his second declaration that "ORC and LNG are distinct technologies, and both are publicly known" and "[a]ny competent engineer with my background and experience would possess independent knowledge, as I do, of both ORC and LNG without needing to draw on specific knowledge gained from the short time I worked at Plug."  Dkt. No. 19-1 at ¶ 14.  He also states that "LNG processes use nitrogen refrigeration cycles that have been utilized in the industry long before Plug started cryogenic hydrogen liquefaction.  To my personal knowledge, Plug has no other similar application for nitrogen refrigeration cycle technology and no relevant proprietary information which could be used by me at ACD."  *Id.* at ¶ 15.  Shokrian does not state there is no proprietary information that could be used for ORC nor does he negate that Nikkiso and ACD engage in hydrogen-related work.

Mr. Ershaghi and Shokrian's declarations do not aid Shokrian's arguments.  Shokrian is missing the forest for the trees.  The non-compete provision does not state only that Shokrian

cannot work on hydrogen fuel systems, himself, but that he cannot "work in any capacity . . . for any business involved" in that realm.  Dkt. No. 2 at ¶ 47.

Shokrian's counsel states in his opposition to Plug Power's motion that "ACD is not involved in the generation, storage, or transport of hydrogen . . . ."  Dkt. No. 19 at 15.  However, Nikkiso's public brochures repeatedly reference hydrogen-related work, including, for example, "ACD's first Hydrogen Mobile Refueler Pump."  Dkt. No. 15-44 at 11.  Shokrian does not dispute anything included in Nikkiso's brochures.  Therefore, it is plausible that Shokrian is violating his non-compete just by working for ACD which is a business involved in hydrogen-related work.  That is sufficient, at this stage of the case, to warrant issuance of the preliminary injunction.

Even if the question was as narrow as Shokrian wants it to be—whether he himself is actively working on hydrogen-related technology—he and his supervisor's declarations are insufficient to sway the Court's decision.   First, the Court finds Shokrian's conduct while still employed at Plug Power and which led to his termination, to be concerning.  Specifically, Shokrian admits in his answer to the complaint that he denied engaging in personal business to human resources while working at Plug Power, but also admits to creating a personal business while employed there.  *See* Dkt. No. 2 at ¶¶ 107-110; Dkt. No. 17 at ¶¶ 107-110.  Shokrian also admits that he instructed a Plug Power employee not to save work on his Plug Power shared drive and not to tell other employees about what the project was.  Dkt. No. 2 at ¶¶ 172-73; Dkt. No. 17 at ¶¶ 17-73.  Shokrian also agrees that he continued to speak to "W2E" for months after he first met with them, *see, e.g.*, Dkt. No. 2 at ¶ 167; Dkt. No. 17 at ¶ 167, even though he denies that Plug Power had decided to stop pursuing "W2E."  Dkt. No. 2 at ¶ 130; Dkt. No. 17 at ¶ 130.  This conduct causes the Court to question the credibility of the statements he makes in his declarations.

31

Second, Mr. Ershaghi and Shokrian assert that ACD's hydrogen-related work is separate from the work that Shokrian does at ACD, but in the brochures and information about Nikkiso provided by Plug Power, Nikkiso itself states that "CE&IG Group's Main Business Areas Related to Lower-Carbon." Dkt. No. 15-42 at 9. Shokrian confirms that he is a member of the "Clean Energy & Industrial Gas Group." Dkt. No. 14-4 at 2. Nikkiso explains that as to "Marine fuel pump/Marine fuel gas supply system," "[a]s a leading provider of LNG fueling and cargo pumps in the marine market, the CE&IG Group continues innovating to help its customers further reduce carbon emissions. Recently[,] the Group . . . was selected to engineer, manufacture and install one of *the world's first hydrogen fuel gas systems for the marine market*." Dkt. No. 15-42 at 9 (emphasis added). Shokrian attests that he is "in charge of creating a technology for LNG . . . boil off gas . . . management for [the] *marine sector*." Dkt. No. 14-4 at 2 (emphasis added). Shokrian does not contest any of this.

Additionally, although Shokrian says that ACD has "a firewall between different business units," he does not attest that he is indeed firewalled off from anything concerning hydrogen-related fuel cell systems. Dkt. No. 14-4 at 3-4. Shokrian's attorney notes that Shokrian "proactively sent out an email requesting a firewall to ensure that he remain uninvolved should Nikkiso engage in any hydrogen-related applications, taking an additional precaution to make sure he was not in violation of the Agreement." Dkt. No. 19 at 15; *see also* Dkt. No. 19-9 at 2-3. Shokrian's e-mail has been provided to the Court. *See* Dkt. No. 19-9 at 2-3. However, Shokrian does not contend that the firewall has ever been put in place, nor has he provided ACD's response to his email (if there is one).

Shokrian attests that he works with the LNG boil off gas sector of Nikkiso and not the hydrogen unit. *See* Dkt. No. 14-4 at 3-4. Shokiran says they "are a different business unit," Dkt.

No. 14-4 at 3, yet all throughout Nikkiso's filings, it states that the CE&IG Group deals with LNG, hydrogen, "and other specialty gases." Dkt. No. 15-43 at 28.

Mr. Kennedy, from Plug Power, states in his declaration that the work Shokrian does with both "ORC and LNG boil off gas for the marine sector applications can involve know-how that Shokrian acquired through his employment with Plug." Dkt. No. 15-2 at ¶ 12. Mr. Kennedy contends "Shokrian could use the know-how acquired through his employment with Plug to work on LNG boil off gas in his role at ACD." *Id.* at ¶ 14. Mr. Kennedy also explains that he is "familiar with Mr. Ershaghi because [Mr. Ershaghi] previously worked for Atlas Copco, a vendor of Plug, and [he] has also worked with Mr. Ershaghi in the course of Plug's relationship with Nikkiso and ACD." *Id.* at ¶ 11. It is Mr. Kennedy's "understanding [] that Mr. Ershaghi and Shokiran became acquainted through Plug's relationship with Atlas Copco, and that Shokrian contacted Mr. Ershaghi in the course of Shokrian's employment with Plug." *Id.*

Regardless, even if Shokrian does not touch anything hydrogen-related at ACD, the non-compete agreement, which Shokrian signed, says he cannot work "for any business involved in generating, transporting, storing or dispensing of hydrogen." Dkt. No. 2 at ¶ 47. Nikkiso is clearly a "business involved in generating, transporting, storing or dispensing hydrogen," and Shokrian signed an agreement stating that he "will not directly or indirectly . . . work in any capacity" for such a business. Dkt. No. 2 at ¶ 47.

Shokrian next argues that his termination was "without good cause" and the accusations against him were "baseless[]" and "a ruse." Dkt. No. 14 at 6, 9. He does not cite a single case, exhibit, or declaration to support those statements. Even in Shokrian's declarations, he does not address his termination. *See* Dkt. Nos. 14-4; 19-1. On the other hand, Mr. Kennedy declares that the allegations in the complaint are true and accurate based on his personal knowledge and a

33

review of Plug Power's business records.  *See* Dkt. No. 15-2 at ¶ 9.  Mr. Kennedy was Shokrian's supervisor at Plug Power.  *See id.* at ¶ 4.  Mr. Kennedy's sworn declaration supports the allegations in the complaint that Shokrian's termination was for cause because he was not being truthful with Plug Power about his personal business endeavors and engagements with W2E.

Importantly, "a 'likelihood of success' requires a demonstration of a 'better than fifty percent' chance of success."  *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 125 (N.D.N.Y. 2022) (citation omitted).  At this stage, the Court need not conclude definitively that Shokrian did in fact violate an enforceable non-compete clause, only that there is a better than fifty percent chance that is the case.  The non-compete provision that Shokrian signed applies not only to hydrogen-related work, but also "any other industries in which [Plug] has done business during Employee's employment with [Plug] or which [Plug] was actively considering during such period."  Dkt. No. 2 at ¶ 47.  Mr. Kennedy affirmed under the penalty of perjury that Plug Power was seeking to do business with ACD while Shokrian was still employed with Plug Power, and that Shokrian's conduct has put projects with ACD and W2E on hold.  *See* Dkt. No. 15-2 at ¶¶ 15-20.

At this stage of the case, this is sufficient to establish a likelihood of success on the merits of Plaintiff's breach of contract claim.

Insofar as Shokrian argues the non-compete clause is too broad, courts have upheld non-compete provisions which contained similar language and, therefore, prohibited similar conduct as what is alleged in this case.  *See, e.g.*, *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 273 (E.D.N.Y. 2002) (finding the restrictive covenant to be enforceable and a likelihood of success on the alleged breach where the non-compete stated the employee could not "engage in or carry on in the business of selling and distributing industrial paper, packaging, food service, office service, and janitorial supplies that are similar to, competitive with, or currently sold by the

34

Company or hereafter sold by the SWC Division or Unisource, or any related business");

*Haggard v. Spine*, No. 09-CV-00721, 2009 WL 1655030, \*6 (D. Colo. June 12, 2009) ("the Non–

Competition Covenant only precludes [the p]laintiff from working for companies that compete

with [the d]efendant in the particular medical device fields in which Defendant operates,

'orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device or

instrumentation technologies, products or services.'  Thus, [the p]laintiff could still work in the

medical sales industry, even in the medical device industry as long as he avoided Defendant's

niche of that industry"); *Copeland LP v. Thurston*, 732 F. Supp. 3d 1003, 1010 (E.D. Mo. 2024)

(concluding that where the employer was "specializing in products for monitoring the quality and

safety of food, pharmaceuticals, and other environmentally sensitive items during cold chain

transport and distribution," "[w]ith respect to scope, the Agreement is reasonable under the

circumstances because the business in which both [the p]laintiff and [the d]efendant engage

involves a limited category of customers around the world").

The provision at issue is extremely limited to businesses that compete with Plug Power.

The provision prevents Shokrian from working with any entity working in proton exchange

membrane fuel cell systems, specific hydrogen-related work, or industries that Plug Power

engaged in while Shokrian was an employee.  *See* Dkt. No. 2 at ¶ 47.  "The 'blue pencil' rule

permits a court to partially enforce a restrictive covenant if 'the unenforceable portion is not an

essential part of the agreed exchange' and the party enforcing the covenant acted in good faith."

*Crye Precision LLC v. Duro Textiles, LLC*, 689 Fed. Appx. 104, 107 (2d Cir. 2017 (summary

order) (citation omitted).  Shokrian does not explain to the Court how the non-compete agreement

could be any narrower.  Indeed, during the July 20, 2026, hearing, Shokrian's counsel argued that

the Court need not tailor the provision because Plug Power could not meet its initial burden of

establishing irreparable harm.  The Court finds that argument to be unpersuasive.  The clause is extremely narrow.  Shokrian has not presented any evidence that application of the provision "as drafted and applied would unfairly restrain h[is] opportunity to pursue h[is] occupation.'"  *Sunbelt Rentals*, 552 F. Supp. 3d at 329.

Plug Power has presented sworn affidavits, public brochures, and Shokrian's own calendar entries as evidence that the non-compete clause is valid and enforceable, Shokrian's termination was for cause, and his employment with ACD violates the non-compete agreement.  At this early stage of the case, that is enough for Plug Power to establish a likelihood of success on its breach of contract claim.

### 3.  *Public Interest and Balance of Equities*

"Before issuing a preliminary injunction, 'a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.'"  *Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744, 2020 WL 7028872, *21 (N.D.N.Y. Sept. 15, 2020) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).  "'Balancing the equities may weigh against enforcement 'where the interests the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from enforcement.'"  *Id.* (quoting *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819, 2018 WL 6786338, *27 (S.D.N.Y. Oct. 25, 2018)).

Courts have concluded that the balance of equities weighs in favor of the employer where the purpose of the injunction is to enforce a signed agreement and the enforcement "'would merely bar [the employee] from violating his non-compete agreement[ ].'"  *Tecspec LLC v. Donnolo*, No. 24-CV-8077, 2025 WL 1604333, *6 (S.D.N.Y. June 6, 2025) (quoting *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014)).  In that

situation "'[i]t would not impose any new legal duty on [the employee]; instead it would give necessary teeth to an existing contractual duty.'" *Id.* (citation omitted).

In other words, "the public interest would be advanced by such an injunction, because . . . such an injunction would tend to encourage parties to abide by their agreements.'" *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 107 (S.D.N.Y. 2021) (citation omitted); *see also A.H. Harris & Sons*, 94 F. Supp. 3d at 302 ("[A]lthough prohibiting Naso from working with White Cap will inevitably affect her employment, thereby causing her harm, the restrictive covenants are not unreasonable and do not prevent her from obtaining other, comparable employment"); *JTH Tax, Inc. v. Sawhney*, No. 19-CV-4035, 2019 WL 3051760, *7 (S.D.N.Y. July 11, 2019) ("Although injunctive relief enforcing the assignment, return, limited noncompete, non-solicitation, and confidentiality provisions of the franchise agreements will burden [the d]efendant by . . . restraining him from working in a tax preparation business at the franchise locations or soliciting such business from former customers within the proscribed territory, in granting such relief, the Court would be enforcing contractual obligations to which [the d]efendant freely agreed and in exchange for which [the d]efendant received the benefits of the franchise arrangement").

The Court finds that the balance of equities weighs in Plug Power's favor. At this time, imposition of the injunction will encourage enforcement of a valid contractual agreement and will not forbid Shokrian from being employed. Enforcement will only prevent Shokrian from being employed in his desired role for a limited period of time. Shokrian has not argued an inability to work at any engineering job in the country. As Plug Power's attorney stated during the hearing, Shokrian could, for example, work for any non-renewable energy company or work on "super conductors splitting hydrogen atoms." Shokrian's non-compete agreement prohibits him from working for a competing business that engages in a narrow utilization of hydrogen in fuel cell

systems.  At this stage, Plug Power has established that ACD qualifies as such a business.  Based on the foregoing, the Court finds that the factors it must consider in deciding whether to impose a preliminary injunction weigh in Plug Power's favor.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submission and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for a preliminary injunction (Dkt. No. 15) is **GRANTED**; and the Court further

**ORDERS** that the state court temporary restraining order is **DISSOLVED**;[4] and the Court further

**ORDERS** that Defendant Mazdak Shokrian is enjoined, pursuant to Rule 65 of the Federal Rules of Civil Procedure, from the date of this Memorandum-Decision and Order through the pendency of this action from:

1.  Directly or indirectly, individually or through any person, firm, corporation or other entity, working in any capacity, consulting with, providing any services to or providing information to any firm, entity or person in the business of designing or manufacturing PEM fuel cell systems for any application or the proton exchange membrane fuel cell system components thereof, PEM MEA's[5] for any application or the components thereof, or for any business involved in

---

[4] "All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."  28 U.S.C. § 1450.

[5] The abbreviations used herein are derived from Plug Power's proposed order, *see* Dkt. No. 15-53, which are found in Shokrian's non-compete agreement, *see* Dkt. No. 2 at ¶ 47.

generating, transporting, storing or dispensing of hydrogen, whether in liquid or gaseous form, including, but not limited to, electrolysis, liquefaction or otherwise, or any other industries in which Plug Power has done business during Shokrian's employment with Plug Power or which Plug Power was actively considering during such period, including, but not limited to, ACD, until at least November 10, 2026;

2. Retaining, using, and/or disclosing, either directly or indirectly, Plug Power's Confidential and Proprietary Company Information; and

3. Directly or indirectly, soliciting, attempting to solicit, accepting business, or assisting any other entity or individual, either directly or indirectly, in soliciting or attempting to solicit, or accepting business from any customers of Plug Power, whether an individual or entity, with whom Shokrian had personal contact or dealings with on behalf of Plug Power or with whom employees reporting to Shokrian had dealing with on behalf of Plug Power, at any time between November 10, 2024 and November 10, 2025, until at least November 10, 2026; and the Court further

ORDERS that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules

**IT IS SO ORDERED.**

Dated:  July 24, 2026
         Albany, New York

Mae A. D'Agostino
U.S. District Judge